***********
The undersigned have reviewed the prior Opinion and Award based upon the record of the proceedings before Deputy Commissioner DeLuca and the briefs and arguments of the parties. The appealing party has not shown good ground to reconsider the evidence, receive further evidence, rehear the parties or their representatives, and having reviewed the competent evidence of record, the Full Commission adopts the Opinion and Award of Deputy Commissioner DeLuca with minor modifications.
 ***********
The Full Commission finds as a fact and concludes as matters of law the following, which were entered into by parties as: *Page 2 
 STIPULATIONS
1. All parties are properly before the Commission and the Commission has jurisdiction of the parties and the subject matter.
2. The issues in this matter are to be presented to the Deputy Commissioner via submission of stipulated exhibits, documents and deposition transcripts. There is no need for a hearing with presentation of live testimony.
3. All exhibits of plaintiffs and defendants which have mutually been agreed upon to be introduced into evidence for substantive purposes, may be introduced without further evidence of relevancy, authenticity, or genuineness.
4. On and prior to September 20, 2003, Timothy Jacobs was an employee of Phillips Jordan, Inc.
5. On September 20, 2003, American Contractors Insurance Group was the carrier on the risk.
6. The parties are subject to and bound by the North Carolina Workers' Compensation Act.
7. Employee-decedent's average weekly wage, as of September 20, 2003, was $704.69 which resulted in a compensation rate of $469.82.
8. The following documentation and exhibits were received into evidence as Stipulated Exhibits:
 a. Stipulated Exhibit 1 Deposition of Patrick Young with deposition exhibits attached;
 b. Stipulated Exhibit 2 Deposition of James Strickland, Jr. with deposition exhibits attached; *Page 3 
 c. Stipulated Exhibit 3 Deposition of Trooper Jeffrey Hammonds with deposition exhibits attached;
 d. Stipulated Exhibit 4 Deposition of Paul Glover with deposition exhibits attached;
 e. Stipulated Exhibit 5 Deposition of H.B. Matthews with deposition exhibits attached;
 f. Stipulated Exhibit 6 Employment records relating to Timothy Jacobs (13 pages) which includes application; new hire records; separation notice; and wage information;
 g. Stipulated Exhibit 7 Daily time tickets for Timothy Jacobs — September 19, 2003 and September 20, 2003 (2 pages);
 h. Stipulated Exhibit 8 Phillips Jordan, Inc. NEW HIRE SAFETY ORIENTATION MANUAL;
 i. Stipulated Exhibit 9 Phillips Jordan, Inc. SAFETY AND LOSS CONTROL MANUAL;
 j. Stipulated Exhibit 10 September 20, 2003 Report of Investigation by Medical Examiner with Toxicology Report (5 pages);
 k. Stipulated Exhibit 11 Bladenboro Rescue ambulance call report (2 pages);
 l. Stipulated Exhibit 12 DMV 349 Accident Report, original (2 pages) and supplemental (2 pages);
 m. Stipulated Exhibit 13 Medical bills;
 n. Stipulated Exhibit 14 Funeral bill;
 o. Stipulated Exhibit 15 Affidavit of Dependency/Heirs; *Page 4 
 p. Stipulated Exhibit 16 IC Form 18;
 q. Stipulated Exhibit 17 IC Form 61; and
 r. Stipulated Exhibit 18 IC Form 19.
 ***********
Based upon all the competent evidence from the record, the Full Commission finds as follows:
 FINDINGS OF FACT
1. As of September 20, 2003, employee-decedent, Timothy Jacobs (hereinafter "decedent"), was a 20-year old male who had been employed by defendant-employer for approximately four months. Decedent's employment involved truck driving and heavy construction. At the time of his death on September 20, 2003, decedent was survived by his parents, Lester Jacobs and Maisey Jacobs. Decedent was not survived by anyone who was either dependent in whole or in part upon decedent-employee for financial support.
2. On September 19, 2003, decedent, along with two co-workers, Patrick Young and James Strickland, were advised by their supervisor that they were being requested to travel from their normal job location in Riegelwood, North Carolina to another job site of their employer which was located outside of Washington, D.C. In order to commute from Riegelwood to Washington, D.C., decedent offered to drive his motor vehicle in which he and Patrick Young and James Strickland would ride. It was agreed between defendant-employer and decedent that decedent would be reimbursed by the employer for mileage. In addition, defendant-employer agreed to pay decedent and his co-workers, Strickland and Young, their hourly rate for all time, including travel, associated with the trip from North Carolina to Washington, D.C., and back. *Page 5 
3. On the afternoon of September 19, 2003, at the direction of defendant-employer, decedent with his passengers Young and Strickland, did depart the Riegelwood area in route to Washington, D.C. Upon arrival in Washington, D.C., the three employees were directed by the employer to check into a hotel. In the early morning hours of September 20, 2003, the three employees were advised by the employer that their services were no longer needed on this job and that they were to return to North Carolina. After a brief sleep, the three employees did begin their trip at approximately noon in route back to North Carolina from the Washington, D.C. job site. In route back to North Carolina, decedent was the sole operator of his automobile with Young and Strickland being passengers. They did stop in Benson, North Carolina to eat food obtained at a fast food restaurant. Based upon expert testimony offered by Paul Glover, an expert in blood alcohol physiology, it is more likely than not that decedent did at least begin, if not continue, the consumption of alcoholic beverages in the Benson area.
4. Upon departing the Benson area, decedent continued in the operation of his motor vehicle south on I-95 toward Lumberton, NC. Decedent exited I-95 at the North Carolina Highway 211 exit at Lumberton. The most direct route of the three employees back to their homes in the Lake Waccamaw area would have been proceeding south on I-95, and taking NC 211 east toward Lake Waccamaw. At the NC 211 exit, decedent did proceed to a convenient store for the sole purpose of obtaining beer. The decision to purchase the beer was a joint decision of the three employees. Decedent stopped the car and a stanger standing outside the store agreed to purchase a 12-pack of beer. While the statements of Young and Strickland vary greatly with regard to the amount of consumption of beer between its purchase and the accident site, all three co-workers consumed beer and decedent continued in the operation of his motor *Page 6 
vehicle while consuming beer. From the site of the convenient store to the accident site was approximately 30 miles and would take approximately 30 minutes to cover by automobile.
5. Defendant-employer maintained and enforced a strict policy prohibiting the consumption of alcoholic beverages while on the job. The use of any alcoholic beverage on the job, or an employee being under the influence of an alcoholic beverage while on the job, could result in immediate termination. Defendant-employer established a cutoff level for blood alcohol at 0.04%. Decedent's operation of his automobile having consumed alcoholic beverages and continuing to consume alcoholic beverage while driving was a direct violation of defendant-employer's safety program and in particular its policy regarding alcoholic beverage possession and use.
6. At approximately 7:30 p.m. on the evening of September 20, 2003, while decedent was in route from the convenient store at the intersection of I-95 and NC 211 to his home in Lake Waccamaw, traveling east on NC 211, decedent did approach the intersection of NC 211 with RP 1763. This stretch of NC 211, as one approached the intersection, was marked with a double yellow line indicating a no passing zone. As decedent approached the intersection, traveling at a high rate of speed, he came upon two vehicles in his lane of travel also proceeding eastward on NC 211. Decedent proceeded to attempt a passing maneuver of the first vehicle. This passing maneuver was done in violation of the clearly marked no passing zone. As decedent began the passing maneuver, another vehicle in front of the vehicle immediately in front of decedent began a left turn onto RP 1763. Decedent, traveling approximately 70 to 80 miles per hour, was unable to take any action to avoid the resulting collision. As a result of the collision, decedent's vehicle crashed. Decedent was partially thrown from the vehicle and pinned under the vehicle, resulting in his immediate death as a result of a broken neck. *Page 7 
7. The investigating officer, Trooper Jeffrey Hammonds, based upon his observations at the scene of the accident, which included multiple empty cans of beer, and having spoken to witnesses, including the passengers in decedent's vehicle, concluded that had decedent survived this accident, he would have charged decedent with driving while impaired, improper passing, reckless driving, and a seatbelt violation.
8. The Bladen County Medical Examiner performed an investigation and submitted his report on the body of decedent. In conjunction with that examination and report, the office of the Chief Medical Examiner did provide a toxicology report reflecting that the blood alcohol content of decedent at the time of his death was .07% BAC. Insufficient credible expert evidence was offered indicating that this blood alcohol reading was anything but an accurate ethanol reading.
9. Paul Glover, is found to be, without objection, an expert in the fields of blood alcohol testing; blood alcohol physiology, pharmacology and related research; effects of drugs on human performance and behavior; impaired driving; and blood and urine testing for drugs of abuse. Mr. Glover offered testimony, which is found to be credible and scientifically sound, that decedent's consumption of an alcoholic beverage resulting in a .07% BAC at the time of his death would have required consumption beginning at least one hour prior to death and would have involved consumption of approximately 4 to 5 beers. The lay testimony of Strickland and Young, passengers in decedent's vehicle with regard to their recollection of decedent's consumption, both with regard to quantity and time, is found not to be credible.
10. This expert opinion regarding the consumption of approximately 4 to 5 beers in the hour preceding death was not credibly contradicted by any expert testimony offered in this matter. Mr. Glover was of the opinion, based upon his education, training and expertise, that *Page 8 
decedent was intoxicated at the time of his accident and death on September 20, 2003; that decedent was impaired in the operation of his vehicle at the time of this accident on September 20, 2003; and that decedent's death on September 20, 2003 was proximately caused by his intoxication.
11. Dr. H.B. Matthews was offered as an expert in metabolic rates and rates of alcohol consumption by humans. Based upon the education, experience, and training, Dr. Matthews is accepted as an expert in this matter. Dr. Matthews professes knowledge and expertise in the field of alcohol metabolic rates which is a physical process regarding the body's absorption of alcohol through a beverage. But, Dr Matthews has never performed any testing or dosing on humans, only research animals. Dr. Matthews has only testified in court one time and that testimony dealt with metabolism of ethanol which is not an issue relevant to this case. Dr. Matthews' published areas of expertise are in chlorine-based compounds and pesticides, with his field of research being chemicals that were involved with the potential for cancer in humans. In response to a request for an opinion in this matter, Dr. Matthews stated, "I cannot say that he was under the influence. I cannot say that he was not under the influence." Dr. Matthews did state, "we all know that alcohol can impair driving ability." And further concluded, "we know something impaired Mr. Jacobs' judgment." The testimony of Dr. Matthews is given less weight than the testimony of Mr. Glover.
12. As evidenced by the accepted and widely utilized positions of the American Medical Association and the National Institute on Alcohol Abuse and Alcoholism, alcohol-related impairment, created through the consumption of an alcoholic beverage, indicates that operators of motor vehicles are susceptible to impairment by low doses of alcohol, and in *Page 9 
particular there is some driving-related impairment for many people at any level of BAC, although substantial and consistent impairment begins at .04% to .05% BAC.
13. Decedent did consume sufficient quantities of an alcoholic beverage and did consume such beverage over a requisite period of time, which resulted in a blood alcohol content reading of .07% BAC at the time of his death on September 20, 2003. Based upon this finding, decedent consumed a sufficient quantity of an intoxicating beverage to cause him to lose the normal control of his bodily or mental faculties, or both, to such an extent that there was an appreciable impairment of either or both of the faculties at the time of the accident.
14. Having consumed the quantity of alcoholic beverages necessary to render decedent impaired, his actions in the operation of his motor vehicle immediately preceding his accident, i.e. his attempt to pass another vehicle in a clearly marked no passing zone, his use of an excessive speed at the time prior to and during the passing maneuver; and his inability to respond to a changing traffic situation, evidence the impairment sustained by decedent as a result of his consumption of an alcoholic beverage.
15. The death of decedent on September 20, 2003 was proximately caused by his intoxication in that his intoxication, while possibly not the sole proximate cause, was more probably than not a proximate cause of the accident and resulting death.
 ***********
Based upon the foregoing stipulations and findings of fact, the Full Commission concludes as follows:
 CONCLUSIONS OF LAW
1. At the time of his death on September 20, 2003, decedent was not acting within the course and scope of his employment. While the act of traveling from his work site in *Page 10 
Washington, D.C. back to his home in North Carolina would have been performed within the course and scope of his employment in that it was done at the direction of his employer and he was to be compensated for both the time associated with the travel and mileage reimbursement for use of his vehicle, decedent's voluntary act of purchasing alcoholic beverages and consuming the same while operating his motor vehicle in an effort to return home, and continuing to consume said beverage up to the time of his accident and resulting death, was a significant and material deviation from the normal course and scope of his employment. In that decedent continued with the consumption of alcoholic beverages, to such an extent as to render him impaired in the operation of his motor vehicle, and such consumption continued up to the time of the accident and his resulting death, decedent did not conclude this deviation nor return to the normal course and scope of his employment. This identifiable deviation from the normal trip home for personal reasons takes decedent out of the course of his employment. The purchase and consumption of an alcoholic beverage while on duty and while operating a motor vehicle for the benefit of his employer, is clearly against the safety policies of defendant-employer. By purchasing and consuming an alcoholic beverage while operating his motor vehicle during the return from work, decedent deviated from his employment and thus, the subsequent accident and resulting death did not arise out of or in the course of employment. Martin v. Georgia-Pac Corp., 5 NC App. 37,167 S.E.2d 790 (1969).
2. The death of decedent on September 20, 2003, was proximately caused by his intoxication. Torain v. Fordham Drug, 79 NC App. 572,340 S.E.2d 111 (1986); Sidney v. Raleigh Paving, 109 NC App. 254,426 S.E.2d 424
(1993). Therefore no compensation shall be payable. N.C. Gen. Stat. § 97-12.
 *********** *Page 11 
Based upon the foregoing findings of fact and conclusions of law, the Full Commission enters the following:
 AWARD
1. The claim for death benefits arising out of the death of decedent is hereby denied.
2. Each party shall bear their costs.
This the 22nd day of May 2008.
S/___________________ DIANNE C. SELLERS COMMISSIONER
CONCURRING:
 S/___________________ LAURA KRANIFELD MAVRETIC COMMISSIONER
 S/___________________ DANNY LEE McDONALD COMMISSIONER *Page 1